The court will proceed to the third case, Bagwe v. Sedgwick Claims. Mr. Wood. Your Honor, this case presents a situation where Plaintiff Appellant Rodna Bagwe, an eight-year employee with an exemplary performance record who had received multiple promotions and awards, complained of pay discrimination in 2008. At the time, her boss, Area Director Papiano, told her to be careful not to shortcut her career and admitted to another manager that if Ms. Bagwe continued, Papiano was not going to be able to stop her boss, Managing Director Tammy LeClaire. But Ms. Bagwe continued to report discriminatory comments by coworkers, and within weeks of that occurring, she was put on a performance improvement plan. When did the question of discriminatory comments on a protected basis first arrive in this case? You keep talking about discriminatory basis, whether she was paid differently than these other people, but we're talking here about whether the federal statute and the basis for discrimination elucidated in those statutes came into play. When did that first come into this case? Ms. Bagwe reported pay discrimination to Stephanie Simpson in the spring of 2008. She again reported discriminatory... And that's disputed, am I correct? That's correct, Your Honor. It is disputed. There are many disputed facts. She then again reported discriminatory comments by coworkers in January and February of 2008 before being placed on a PIP in March of 2009. Those are the Atlanta comments? That's correct, Your Honor. She reported those in January and February of 2009 shortly before being placed on a PIP in March of 2009. She again raised discriminatory comments by a coworker in May while successfully completing the performance improvement plan. What remarks were those? That a coworker had been referred to as you people. There was a reference to the fact that Hispanics were living in Pilsen by remarks made by a woman named Ann Coyle. Well, that was a fairly guarded comment, wasn't it? I'm not sure what Your Honor means by guarded. It was said at a business meeting among coworkers and Ms. Bagwe reasonably believed it violated Title VII and... She believed it, but there was no overt ethnic remark made, was there? I believe it is an overt ethnic remark. It's characterizing people by race in the workplace. Just as the comment... What, you people? In the context of the remark, yes. You're referring to a Hispanic person and talking to him as though his people and making a derogatory comment about not traveling to Pilsen. All of this pales in comparison to her supervisor calling her an Indian bitch on the day that she was terminated. After this deployment decision had already been made, correct? Correct, Your Honor, and the magistrate decided based on that fact that it could not possibly have been relevant to the determination, but would Your Honors not consider a statement by a juror in the context of a Batson challenge when they report, the lawyer said Indian bitch as I was walking out the courtroom door. The fact that the comment merely came after the fact does not in any way mitigate the possibility that it could be reflective of unlawful bias at the time of the decision. And it's just one of the pieces of evidence that Ms. Bagwe presented. The court discounted, the magistrate discounted the comment under a misapplication of the Stray Remarks Doctrine. It misinterpreted this court's decision in Tank versus T-Mobile to mean that any comment that is not a biased comment by a decision maker around the time of the decision and in reference to the employment action is a stray remark that could not give rise to an inference of bias. That's problematic for two reasons. First, it leaves only direct evidence. That type of comment by a decision maker at the time of the decision and in reference to the employment action gives rise to unlawful motive without resort to inference. It is direct evidence of the type this court has said is not required. Second, and most importantly from this court's perspective, it directly conflicts with this Supreme Court's holding in Reeves versus Sanderson-Plumbing. In Reeves, the Supreme Court made clear that the district court cannot discount discriminatory comments by decision makers merely because they were not made in the direct context of the employment decision. For the district court in this case, the magistrate to have held otherwise directly conflicts with Reeves. The magistrate indicated in its opinion that there was no other evidence that could support a finding of discrimination or retaliation, but that just simply isn't the case. There is ample evidence of pretext from which a jury would not be required to believe the proffered explanation, including the fact that the explanation conflicts with contemporaneous objective evidence that Ms. Bogway's performance was satisfactory. First, Human Resources Representative Carla Street testified that she never saw communication problems with Ms. Bogway even though she attended weekly meetings with her. Second, Ms. Papiano's own handwritten notes reflect that the, quote, teamwork approach had worked itself out. And third, a performance management eye chart, a tool that the company used to assess leadership capabilities, showed that Ms. Bogway's team, the AT&T Chicago team, was performing better than one of her white peers, an operations manager for the AT&T South team, based on metrics like my immediate supervisor listens. So the notion that there were problems with communications on her team is underlied by objective evidence. The explanations are also underlied by inconsistencies in defendants' own statements. Ms. Bogway was told at the time of her termination that it was not based on performance, that there was a lack of trust by Ms. Bogway of her leaders, something you might imagine would be occurring when the managers are being accused of discrimination. A jury could infer from those comments that that's exactly what the lack of trust referred to. Defendants claim that Ms. Papiano and Ms. LeClaire noticed that any issues she was having weren't improving, but that an incident with an employee named Tanya Warner was the, quote, unquote, last straw. But Ms. Papiano testified that there was a consensus conference call in which everyone discussed her termination and that the Warner incident was not raised. She also admitted that Ms. Bogway had handled the Warner incident in the exact manner she had been instructed. From this evidence, a jury could infer that Ms. Papiano and LeClaire were making up reasons to cover their unlawful biases. Other evidence of that same fact exists. Ms. Papiano provided a list to Human Resources of the reasons for the termination, again after the fact, some of which she admits herself were not the basis for the termination and one of which she had no evidence to support until after the decision to terminate had already been made. From this evidence, a jury could infer that the defendants were digging up dirt to cover up the fact that they wanted to get rid of this Indian bitch who refused to accept the fact that her pay was not discriminatorily low. Perhaps most tellingly, under the company's policies, the senior most person in Human Resources, the Chief People Officer, Terry Brown, was required to review and approve the grounds for termination. According to Ms. LeClaire and Ms. Papiano, there was this consensus conference call or at least some discussions with Ms. Brown, but Ms. Brown disputes ever talking to them about any of the performance problems. According to her, the only information on which she approved the termination decision came from information in the report prepared of the investigation of Ms. Bogway's allegations of discrimination and retaliation. From that evidence, a jury could infer that when Ms. Bogway complained of discrimination and retaliation, the company wrote a report that it then relied upon to fire her as compared to address her allegations of termination. All of this was lost on the district court because it was confused as to the burdens and the intricacies and the elements with respect to the burden shifting methods of the indirect and direct method.  Recently, this court has emphasized that focusing on the ultimate inquiry, was a party discriminated against or retaliated against, is what the focus of the law should be. Two cases warrant discussion. One, a case from May of 2015, Castro versus DeFry University, in which this court said whether to use the frameworks of the burden shifting methods or quote, cut to the chase and ask the fundamental question directly, could a reasonable trier of fact infer retaliation makes no difference. Going one step further, more recently in June, in Miller versus St. Joseph County, the court applied the three-pronged standard first enumerated by Chief Judge Wood and her concurrence in Coleman. Under that standard, the elements are simple. Plaintiff must show she's in a class protected by the statute, that she suffered the requisite adverse employment action, and that a rational jury could conclude that the employer took the adverse action on account of her protected class. We've also said since those cases, however, that it's certainly appropriate to consider the traditional frameworks of the indirect and direct methods of a defendant to defend on that basis at summary judgment or for a district court to enter summary judgment using those frameworks. That is correct, Your Honor. So we don't have an indirect claim here. There isn't an effort to prove the case on that basis. This is what would, under the old rubric, be called a direct evidence claim. That's not exactly correct. Defendants, when they filed their motions for summary judgment, moved under the direct and indirect method. Plaintiff responded to the arguments that were raised at that time under both the direct and the indirect method with respect to the termination, citing Mr. Enneking as a comparator. The problem, of course, is that when performance-based decisions occur, the evidence of whether or not she's successfully performing her job is relevant to the prima facie case under McDonnell-Douglas burden shifting, pretext under McDonnell-Douglas burden shifting, as well as circumstantial evidence under the direct method. It all merges together, as the court has said in numerous cases. Right. The same evidence may serve a variety of purposes depending on which framework is used or if we're just cutting to the chase and asking the basic discrimination question about whether a jury could infer discrimination from the evidence. The point I'm making is that this case hasn't been litigated, at least on appeal, on an indirect method. I didn't see an argument developed on Enneking's, if I'm pronouncing it correctly, status as a comparator. I understand your argument to be that this is a direct evidence claim, meaning direct and circumstantial evidence of discrimination rather than prove the claim by reference to comparators similarly situated who received better treatment, which would be a hard argument to make here because Enneking was fired. Right? Not until he, and we do make the argument in the brief, I can pinpoint to your honors where in a letter, but we do make the argument that the jury misinterpreted the evidence about Enneking. He wasn't fired or disciplined or anything until he engaged in an error that cost the company money. Until that point, his leadership issues were tolerated. So the argument would be they would be tolerated up until the point in which time that he cost the company money, and for Ms. Bogway, they weren't tolerated because she had engaged in protected activities. Mr. Wood, let's get an explicit statement from you right now. Are you proceeding on a direct case or an indirect case under the old paradigm? Both methods, your honor. Plaintiff can prevail under both methods. Is there a qualitative difference? In other words, is it easier for you to, I'm sorry, I'm swiftly shifting down, talking about the so-called traditional McDonnell-Douglas method on one hand and the Hamilton-Posner, whatever it is, Wood, super deluxe method. Is one easier for the plaintiff than the other? Because we're seeing a lot of plaintiffs want to argue the new method. And I'm just wondering, you keep telling us there's no difference, but there must be. That's why plaintiff's lawyers are always arguing about it or always fostering that. One method, the indirect method, if required to be used, imposes on the plaintiff need not face at trial. It requires a plaintiff evidence that she can win a trial without presenting. So to the extent the McDonnell-Douglas burden shifting method is required to be analyzed or required to be satisfied, it can be harder in cases. So you are saying that there are cases where on summary judgment a plaintiff may not prevail if the court uses the traditional McDonnell-Douglas methods but may prevail and be able to defeat a defendant's motion for summary judgment under the other. Am I correct? Yes. And there are a variety of other. So is there a change in the law? No. There have always been, and I see I'm into my time, hoping to have some rebuttal time. There are and always have been a multitude of ways in which a plaintiff can prevail and show a violation of Title VII and comparably Section 1981. Catspaw, we haven't discussed it. Disparate impact, not really relevant at this point. But the variety of ways in which a plaintiff can show unlawful employment discrimination should not be limited or contailed. You should focus on the fundamental question of whether the plaintiff can show the adverse action was on account of the protected class status because any other interpretation limits the theories of proof available to a plaintiff and undermines the statutory purpose. Thank you, Your Honors. Thank you, Mr. Wood. Ms. Keetha Parl. May it please the Court. My name is Monica Keetha Parl, and I represent the appellees in this case, Cedra Claims Management, Angela Papianu, and Tammy LeClaire. This Court should affirm the District Court's grant of summary judgment for a very simple reason. Given a close review of the evidence, no reasonable jury could decide the defendant took any adverse action based on Bagui's race, national origin, or protected activity. Bagui knows her evidence is weak. In fact, in her summary judgment response, she says a number of weak proofs can add up to a strong proof. But when we take a close look at the evidence, it's clear that the individual bits and pieces that she relies on are either totally unsupported by the record, immaterial, or can easily be explained without reference to any inference. So your case really is no matter which method is used, the traditional McDonnell-Douglas method or the new super deluxe model. The fact of the matter is there's not enough here, there's not a convincing mosaic to submit to a jury. Am I right? Absolutely. We moved for summary judgment on the traditional McDonnell-Douglas standard because, as Judge Posner noted in the Miller v. St. Joseph County case very recently, it's still the law of the land. It's still what the Supreme Court has issued, and so we still have to proceed under that framework. However, under either framework, in this case it doesn't matter. Even if we want to cut to the chase and apply the standards that Judge Wood advocated for in the Coleman concurrence, we still have a plaintiff who has not proffered compelling evidence supported by the record that any reasonable jury could find that she suffered some sort of adverse action on a protected basis. One example of this is something that counsel brought up initially during his arguments. He claimed that the plaintiff had complained about pay discrimination back in 2008. That's not true. The record is very clear that her claims, her complaints about pay discrimination as they were raised in 2008 had nothing to do with her race or national origin. Is there a piece of paper in the record that makes that clear? Yes, there is. There's testimony. There's a lot of that type of paper. There's testimony by all of the witnesses involved. There's testimony by Tammy LeClaire and Angela Papianu. Is there any piece of paper by the plaintiff making it clear that she's complaining on some ground other than a protected ground? The testimony by the plaintiff outlines what she was complaining about early on in 2008, and nowhere in the record does she state that in 2008 she was complaining on the basis of race or national origin. I want to clarify, though, one thing. Counsel is correct that she complained to colleague resources and brought up potential discrimination in that context. However, the individual she complained to was somebody in Memphis, the corporate headquarters where the plaintiff was here in Chicago. There's absolutely no evidence that that was communicated to any of the decision makers. So that's the type of thing that the district court did. What was that conversation about? She's talking to this person in Memphis. Was it about her salary situation? She complained about two separate pay decisions. She complained about the fact... I understand that for the record, but she was talking to this person about her salary situation. She was. So the fact that she wasn't talking to a decision maker is not her problem. It's not her... It's the problem of the person who heard it has to get it to the right person. But in the end, a discrimination or a retaliation claim has to have some relation back to a protected activity and an adverse action. And if the decision makers here who had involvement in the adverse action had no knowledge of any protected activity, that cuts off the claim right away. Is there any evidence that they had no knowledge? You would expect in the normal course of corporate events for your Memphis person to have communicated pretty quickly to other people. Hey, your Chicago plaintiff is starting to talk about race and ethnicity now. We've got another kind of problem. Your Honor, this court's precedent has repeatedly held that summary judgment is the put up or shut up moment. It was plaintiff's burden to proffer some sort of evidence. She is certainly entitled to reasonable inferences, but she's not entitled to speculation. She can't manufacture an issue of fact by inventing facts. There's simply absolutely nothing in the record to even suggest by inference that that was communicated. In fact, although plaintiff claims that she brought up race and national origin in 2008 to Stephanie Simpson, and we accept that as we must during summary judgment, Stephanie Simpson claims that she did not understand it in that way. And there's, again, absolutely nothing to say that that was communicated anywhere to any decision maker. The record is clear that the first protected activity came in February 2009 when Bagway complained about Ann Coyle's remarks that she had made a year earlier that were racial remarks, and that reached... Are these the Atlanta remarks? I'm sorry? Are these the Atlanta remarks? Yes, these are the Atlanta remarks. Which had their own problems. Now, your brother says we can consider those because even though they were in a social situation, they show bias on the part of decision makers. What's your reply to that? It's not just that it's a social situation. There's a myriad of reasons why those remarks are not probative here. They were made, again, in a social situation, at a bar, the night before a work-related event, in a conversation that had absolutely nothing to do with work. The individuals involved were discussing one of their divorces, and she had made a comment that you should get rid of your old Indian husband. I can help you find somebody more fun, essentially. That has nothing to do with work. This is the reason why we have a stray remarks doctrine. Otherwise, this court would be inundated with claims of plaintiffs who claim that somebody in their workplace once made a remark that was off color, that was inappropriate. That doesn't rise to the level of discrimination, and it has to also relate to some sort of adverse action. There was absolutely no nexus. This court's precedent is clear that a remark has to be both proximately related and causally related, and the old Indian husband remark really is neither. Truly, it's a red herring. However, the fact that the plaintiff brought it up in February 2009 goes to, I think what she is proffering is that it goes to the retaliation claim. We think it's a very weak argument on discrimination. So far you've been talking about the pay claim, am I right? We had discussed the pay claim, yes. Now you're going to move to the other claim, retaliation? We can move between the two. I'm trying to keep them straight in my mind. Your brother elided from one to the other without a break, and I'm trying to see what evidence there is for each of those claims. Well, as an initial matter, the substance of the pay claim shouldn't be considered because it wasn't raised at the district court in response in summary judgment. Judge Kim correctly noted that although the defendants moved to dismiss the pay claims, both substantively and on statute of limitations grounds, the plaintiff didn't respond. And so she can't bring that up for the first time on appeal. And that has been waived, as we've described in our suit. She claims that complaints about pay relate to her retaliation claim. But, again, those complaints are only probative of retaliation after they start introducing some sort of bias. It can't be that it's just a general complaint. That's not actionable. This court has held that an adverse action has to be linked to protected activity, not just problematic hostility. So to the extent that she complains generally about her pay, it wasn't until the moment that a decision-maker related to an adverse action knew or understood it to be about something protected. It seems to me his strongest claim is that she may, taking the facts as she sees them, she complained about her pay, said it was race- and ethnic-based. They investigated it. They found out there was no basis for it. And she kept on nagging about it. And they finally said, that's it. We've had enough. We've got a headache on you. And got rid of it. She says that's retaliation. They have to put up with my giving them a headache about my race-based claim. Why isn't that enough to get to a jury on the retaliation? Pragmatically, in taking things as a whole, a plaintiff shouldn't be able to manufacture some sort of temporal relationship between her complaints and an adverse action by repeatedly making them over and over and over again, despite having no factual beef with the outcome of the investigation. A defendant, an employer, shouldn't be forced to hold on to an employee just because she's making complaints or else fear a lawsuit. The reality here is that there is ample evidence of an ongoing problem with her interpersonal and communication skills. Nine individuals complained over the course of two years. Those individuals were both inside and outside her protecting class, African-American employees, Hispanic employees, supervisors, peers, her mentor. They complained back to 2008. Two different people complained within weeks of her termination, not just Tanya Warner but also John Dooley, who complained to Papiano as she was on vacation in Greece in July, just a few weeks before the termination. After the termination, additional individuals confirmed the reason that the decision had been made. So in this case, there's ample evidence that the reason is not pretextual. The reason asserted was not pretextual, not at all. In the face of non-pretextual evidence and justifications for termination, the plaintiff's continued complaints go only to timing, and this court has repeatedly held that timing alone cannot form the basis of a retaliation claim, and that's really all she has because once you look at the evidence in detail, critically, you see that really it is just timing. The substance just isn't there. What about the communication with future employers? There's no admissible evidence about communication with future employers. The only evidence that she relies on is the affidavit of Christie Peace, which is hearsay upon hearsay and lacks foundation. The district court judge was absolutely correct in discounting that. It was her burden to prove that there was some communication, and there's absolutely nothing in the record to back that up. She still has to rely on admissible evidence, not just conjecture and speculation. Taking everything as a whole, in the end, the plaintiff has only proven what this court has repeatedly held. It has been inadequate. It's an amorphous litany of complaints, albeit persistent complaints, none of which hold water after a close inspection of the record. In the end, zero plus zero equals zero, and that's exactly what this plaintiff has offered this court, and for those reasons and the reasons in our brief, if Your Honors have no further questions, we rest. Thank you. Thank you, Ms. Skitarpa. Thank you. Mr. Wood, I think your time has expired, but you may have an additional two minutes. The few issues that Your Honors raised that I'll leave to our briefs, including why the pay discrimination claim was not addressed on the merits of summary judgment. The social situation in which Ms. LeClaire told Ms. Bogway she should get rid of her old Indian husband because white men were more fun is the precise type of situation in which a manager of a company is going to feel comfortable enough to reveal the biases that they hold, or so a jury could conclude. Ms. Skitarpa points out that there were nine individuals who complained about Ms. Dooley in two years, yet defendants' witnesses, whose burden it is to explain why she was fired, could not identify many of those instances as the basis for her termination during their depositions. Examine the record carefully, review their testimony, and decide as a judge, is this testimony a jury is required to accept as a matter of law, given the innumerable inconsistencies between them, between a same witness' deposition and their declaration, and the shifting explanations that were offered. This court should not fall prey to the arguments that are designed to have it weigh the evidence and make factual determinations. If any one of you believes, looking at the evidence, that a reasonable jury could answer the fundamental question of whether or not Ms. Bogway was discriminated or retaliated against affirmatively, then ask yourselves, if you don't believe that, is my brethren looking at this in a way that is unreasonable as a matter of law? The magistrate held that the jury could not infer unlawful discrimination from Ms. Papiano calling Ms. Bogway an Indian bitch on her termination day. It also ruled that the jury was required to accept, as a matter of law, an explanation that in a situation with Tanya Warner motivated the termination decision, even though Ms. Papiano herself admits it was handled correctly and was not discussed during the termination conference call. Neither of the magistrate's rulings comport with Reeves. Accordingly, regardless of the framework applied, summary judgment should be reversed. Thank you, Mr. Wood. Thanks to both counsel. The case is taken under advisement.